```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND

FREDERICK E. BOUCHAT            *

            Plaintiff            *

       vs.                       *   CIVIL ACTION NO. MJG-08-397

BALTIMORE RAVENS LIMITED         *
PARTNERSHIP, et al.
                                 *
            Defendants
*       *       *       *       *       *       *       *       *
```

## MEMORANDUM OF DECISION ON REMAND

The Court has conducted proceedings, including a bench trial, on remand of the instant case pursuant to the decision in Bouchat v. Baltimore Ravens Ltd. P'ship, 619 F.3d 301 (4th Cir. 2010)(hereinafter referred to as "Bouchat 2010"). The Court now issues this Memorandum of Decision on Remand as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found it reasonable to draw from the evidence.

I.   BACKGROUND

Discussions of the pertinent background can be found in no less than seven (so far) published decisions of this Court and

the United States Court of Appeals for the Fourth Circuit.[1]
Accordingly, a brief background statement shall suffice.

In late 1995, the Cleveland Browns football team moved to Baltimore.  However, because the owner agreed to leave the Browns' name in Cleveland for use by a replacement team, a new name was needed for Baltimore.  In December 1995, while the owners were considering a name to choose, an amateur artist, Frederick E. Bouchat ("Bouchat") created drawings of insignia that he imagined might be used by the new football team depending upon the name selected.  These included such names as the Bombers, the Americans, the Jockeys, etc. and, of course, "the Ravens."

Bouchat prepared a drawing for a Ravens team referred to as the "Shield Drawing."



---

[1] Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350 (4th Cir. 2001); Bouchat v. Baltimore Ravens, Inc., 215 F. Supp. 2d 611 (D. Md. 2002); Bouchat v. Baltimore Ravens, Inc., 346 F.3d 514 (4th Cir. 2003); Bouchat v. Champion Products, Inc., 327 F. Supp. 2d 537 (D. Md. 2003); Bouchat v. The Bon-Ton Dept. Stores, Inc., 506 F.3d 315 (4th Cir. 2007); Bouchat v. Baltimore Ravens Ltd. P'ship, 587 F. Supp. 2d 686 (D. Md. 2008); Bouchat v. Baltimore Ravens Ltd. P'ship, 619 F.3d 301 (4th Cir. 2010).

By virtue of his creating the drawing, Bouchat obtained common law copyright rights therein.

A copy of the Shield Drawing was sent by Bouchat to the head of the Baltimore Stadium Authority and ended up with the commercial artists retained by the National Football League ("NFL") and the Baltimore Ravens team ("the Ravens")[2] to design the team's insignia and uniforms.  The artists infringed Bouchat's copyright by copying the Shield Drawing and creating what is referred to as the "Flying B Logo."



The Ravens used the Flying B Logo as the teams' primary logo during the first three seasons, 1996, 1997, and 1998.

Bouchat sued the NFL and Ravens and established infringement of his copyright in the Shield Drawing by their use of the Flying B Logo.  Bouchat, however, recovered no damages due to a jury's finding that no part of the profits of the infringers, relating to the infringements then at issue, had

---

[2] In view of the numerous entities involved in the litigation, the Court's references to the "NFL" and "Ravens" are intended, collectively, to refer to all pertinent entities affiliated with the league and the team respectively.

been attributable to the copyright infringement.  This Court's Judgment, awarding no damages, was affirmed by the United States Court of Appeals for the Fourth Circuit.[3]

In 1999, the Ravens adopted a new logo that has been used since.



For about eight years, the NFL and the Ravens did not make any significant use of the Flying B Logo.[4]  However, in or about 2008, Bouchat found that the Ravens and the NFL were using the Flying B Logo in three manners:

> 1. The sale of season highlight films showing the 1996-98 Ravens on which the Flying B Logo was visible,
>
> 2. The display at football games of film clips of Ravens' teams from 1996-98 on which the Flying B Logo was visible, and
>
> 3. The display at the Ravens team headquarters of photographs of players and memorabilia (such as a first game ticket) on which the Flying B Logo was visible.

---

[3] Bouchat v. Baltimore Ravens, Inc., 346 F.3d 514 (4th Cir. 2003).
[4] There were a few occasions on which the Flying B Logo was used, apparently by inadvertence – for example on a ticket for a Packers – Ravens game at Green Bay.

Bouchat brought the instant lawsuit, seeking to enjoin these uses of the Flying B Logo.

This Court, deciding the case on an agreed submitted record, held that there was no infringement because each of these uses was a non-infringing fair use under 17 U.S.C. § 107. Bouchat v. Baltimore Ravens Ltd. P'ship, 587 F. Supp. 2d 686 (D. Md. 2008). On appeal, the United States Court of Appeals for the Fourth Circuit reversed in part. The Fourth Circuit agreed with this Court's holding that the aforesaid headquarters display was a fair use. However, the appellate court held that the sale of highlight films and display of film clips at football games was not. The panel's majority decision stated:

> We reverse in part because the Ravens and the NFL did not establish fair use of the Flying B logo in the highlight films sold by the NFL and the highlight film played during the Ravens home football games. The films infringe on Bouchat's copyrighted work, and his request for injunctive relief against this infringement is not precluded. On remand the district court will consider whether an injunction is appropriate.

Bouchat 2010, 619 F.3d at 317.

In the Memorandum and Order Re: Permanent Injunction [Document 52], the Court declined to grant Bouchat an injunction against future use of the Flying B Logo in the films at issue

provided that he receive reasonable compensation for any such use.

II.  DISCUSSION

   A.   Authority to Determine Reasonable Compensation

   In Bouchat 2010, the United States Court of Appeals for the Fourth Circuit held that it must "permit[] the district court to decide in the first place whether to grant or deny [injunctive] relief."  Bouchat 2010 , 619 F.3d at 317 n. 2.  Accordingly, the appellate court stated that "[o]n remand the district court will consider whether an injunction is appropriate."  Defendants contend that the Fourth Circuit, thereby, restricted this Court's authority to issue a decision that does no more than make the "binary" decision to grant or deny an injunction.  The Court disagrees.

   The case of Abend v. MCA, Inc., 863 F.2d 1465 (9th Cir. 1988), presented a situation analogous to the instant case and a decision that the Court finds persuasive.  In Abend, the owner of the copyright on a novel established infringement by the movie "Rear Window."  The copyright owner sought an injunction against distribution of the motion picture.

6

The Abend court recognized that the value of contributions of non-infringers to an infringing movie can warrant the denial of injunctive relief, stating:

> We are mindful that this case presents compelling equitable considerations which should be taken into account by the district court in fashioning an appropriate remedy in the event defendants fail to establish any equitable defenses. Defendants invested substantial money, effort, and talent in creating the "Rear Window" film. Clearly the tremendous success of that venture initially and upon re-release is attributable in significant measure to, inter alia, the outstanding performances of its stars-Grace Kelly and James Stewart-and the brilliant directing of Alfred Hitchcock. The district court must recognize this contribution in determining Abend's remedy.
>
> . . . .
>
> The "Rear Window" film resulted from the collaborative efforts of many talented individuals other than Cornell Woolrich, the author of the underlying story. The success of the movie resulted in large part from factors completely unrelated to the underlying story, "It Had To Be Murder." It would cause a great injustice for the owners of the film if the court enjoined them from further exhibition of the movie. . . . We also note that an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come.

Id. at 1478-79.

The Abend court observed that "courts might . . . award damages or a continuing royalty instead of an injunction in such

7

special circumstances"[5] and that "Abend can be compensated adequately for the infringement by monetary compensation." Id. at 1479.

This Court found circumstances existing analogous to those presented in Abend.  The ability of the Court to provide reasonable compensation to Bouchat for the Defendants' infringing use of his copyright-protected work was a determinative factor in its decision to deny injunctive relief.

This Court will not permit Defendants to take Bouchat's intellectual property without recognition of his authorship and without any compensation whatsoever.  While the amount of compensation reasonably due Bouchat may be small, it should not be zero.  The United States Court of Appeals for the Fourth Circuit has rejected Defendants' contention that the uses at issue are non-infringing fair uses.  If, as Defendants contend, this Court could not provide Bouchat any compensation whatsoever, this Court would grant Bouchat the injunctive relief sought.

The Court will, therefore, determine the amount of compensation that must be paid Bouchat for any repetition of the uses at issue of the Flying B Logo.

---

[5] Citing 3 M. Nimmer, Nimmer on Copyright § 14.06[B] at 14-56.2 (1988)).

B.  Reasonable Compensation

The Court finds that the reasonable compensation due Bouchat for repetitions of the infringements at issue would be a reasonable royalty for the uses of his copyright-protected work.

It may well be true, as contended by Defendants, that the Shield Drawing has no fair market value separate and apart from the Flying B Logo, which derives its value entirely from its association with the Ravens.  Moreover, Bouchat has never sold, licensed or attempted to sell or license, the Shield Drawing.[6]  Nevertheless, the Flying B Logo is an improvement of the Shield Drawing and is, in and of itself, an infringement of Bouchat's copyright.  Hence, the market for the Flying B Logo includes, in effect, the market for Bouchat's copyright-protected work in the Shield Drawing.

While Defendants may doggedly refuse to recognize it, the fact remains that any future infringement of Bouchat's copyright will constitute taking Bouchat's property.  As stated by the United States Court of Appeals for the Second Circuit:

---

[6] Or any other of his drawings.

> [A]s between leaving the victim of the illegal taking with nothing, and charging the illegal taker with the reasonable cost of what he took, the latter, at least in some circumstances, is the preferable solution.

Davis v. The Gap, Inc., 246 F.3d 152, 166 (2d Cir. 2001).

The instant case presents a circumstance in which it is preferable to pay the copyright owner reasonable compensation rather than let the Defendants continue to infringe without cost or consequence.  While, in view of the nature of the infringing uses at issue, the amount of reasonable compensation must be small, it will not be zero.

The Court shall determine the reasonable compensation due Bouchat for repetitions of the infringements at issue, by "consider[ing] all evidence relevant to a hypothetical negotiation" and determining the fair market value of a license for the infringing use. Gaylord v. United States, 678 F.3d 1339, 1344 (Fed. Cir. 2012).  The fair market value shall be "calculated based on a hypothetical, arms-length negotiation between the parties." Id. at 1343.[7]  The Court shall "not rule

---

[7] In patent infringement cases, the hypothetical negotiation approach attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.  See Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)(articulating a list of fifteen factors by which a reasonable royalty may be calculated).  The Federal Circuit noted, referring to the Georgia-Pacific test, that

out the possibility that a one-time, paid-up license accurately reflects the fair market value of a license" for an infringing use. Id. at 1345.

    1.   Highlight Films

The Court finds that, in hypothetical negotiations conducted in 2013,[8] the Defendants would desire to pay a one-time royalty rather than have the burden of determining and paying royalties on each sale and that Bouchat would reasonably accept a one-time payment rather than to receive annual checks of the modest amounts that would be due him. Moreover, the Court finds that the Defendants would offer a one-time payment that would exceed the amount that would be due on the basis of assumptions so favorable to Bouchat as to exceed the maximum amount he could rationally hope to recover in litigation, and Defendants would pay such a "premium" based on the ability to avoid a "gap" in their collection of highlight films for sale.

Thus, the Court determines the hypothetically agreed royalty on the following assumptions:

---

"[d]etermining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge." Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988).

[8] Since this decision is issued in late December 2012, the earliest reasonable date for a negotiation of reasonable compensation for future use is in the year 2013.

- That Bouchat would be receiving royalties for 85 years from the date of the negotiations.[9]

- That each copy of the highlight films will sell for $50.00.[10]

- That each year Defendants will sell one copy of a Ravens highlight film and four copies of Ravens' opponents' highlight films for the 1996-98 seasons.[11]

- That a royalty would be due at the rate of 11.3% - the rate claimed by Bouchat – and that the royalty would be paid on the gross proceeds without consideration of any costs associated with the sales.[12]

- That on each sale of a Ravens' highlight film, the royalty would be $5.65[13] and on each sale of a Ravens' opponent's highlight film, the royalty would be $.71.[14]

---

[9] This assumes that there will be an undiminished stream of sales of season highlight films from the 1996-98 seasons continuing for a century after the 1998 season and that Bouchat lives for at least 15 years from the date of the agreement (since the copyright lasts for 70 years after his death).

[10] There is no reason to assume that, in terms of present dollars, the price of the films will increase.

[11] This assumption is substantially in excess of the actual sales for the past seven years as reflected in the evidence. Defendants submitted records of past orders for the highlight films – three orders for a total of nine films were submitted for the 1996-98 Ravens' highlight films, and none have been ordered since September 2008. Thirty-four opponents' films for the 1996-98 seasons were ordered during the same time period, and twelve were ordered during the past four years.

[12] Although, in fact, the Defendants have substantial expenses in regard to each sale.

[13] That is, 11.3% of $50.00.

[14] This is based upon the assumption that each such opponent would have played the Ravens in two (rather than one) of their sixteen games. Thus, it is assumed that one-eighth of each such film is devoted to the Ravens' games. Therefore, the assumption is that a royalty of 11.3% is due on $6.25 (one-eighth of the $50.00 received), i.e., $.71.

- Hence, for each of 85 years, Bouchat would be entitled to a total royalty payment of $8.49.[15]

On the aforesaid assumptions, Bouchat would receive 85 annual payments of $8.49, totaling $721.65.  If reduced to present value using a modest discount rate of 1%, the present value of the income stream would be less than $500.00.  However, the Court further finds that the Defendants would be willing to pay the undiscounted amount of $721.65 to close the deal.  The Court further finds that Bouchat, with no reasonable basis to expect to receive any more than the offer, would accept.

Thus, the Court finds that reasonable compensation for future infringements of Bouchat's copyright by the sale of season highlight films would be a one-time payment of $721.65.

### 2.  Memorable Moments

The evidence establishes that on one occasion, during a game between the Ravens and the Saint Louis Rams, a video clip of a prior game in which the Ravens team wore the Flying B Logo was shown on the stadium scoreboard screen.  As best can be determined from the evidence, the clip was on the stadium screen no more than 45 seconds and may well have been substantially

---

[15] That is $5.65 for the Ravens' highlight films and $2.84 for the four Ravens' opponents' highlight films.

13

less.[16]  Moreover, it appears highly unlikely that the Ravens will again use a video clip from the 1996-98 season in a similar manner.[17]

Bouchat takes the position that a royalty for a future infringement of the type at issue should be set by reference to the duration of the video clip and the profits derived from ticket sales for the game.  However, the evidence of record provides no reasonable basis for making such a determination.

Perhaps the Court could make a "ballpark" rough estimate of $7,000,000.00 of gross receipts from ticket sales at a typical Ravens game by assuming sales of 70,000 tickets at $100.00.  The Court might also estimate that a typical ticket is paid for in stadium entertainment over 200 minutes and that the entertainment would include a 45 second video clip shown on the scoreboard, i.e., .375% of the stadium time purchased. Even if the Court were to assume that there should be a royalty based on 11.3% of .375% of ticket sales profits, the record does not permit even a rough estimate of the pertinent net proceeds.[18]

---

[16] The video clip in evidence is raw footage rather than the finished product shown at the game.  Therefore, it is not possible to determine the duration of the clip that was actually shown at the game.
[17] The Court does not have before it, and is not addressing, possible showings of video clips from the 1996-98 seasons for special purposes, such as ones commemorating former players.
[18] Indeed, if the Court were to take judicial notice of the current NFL salary cap and assume the Ravens paid player

The Court does not foreclose the possibility that there could be evidence permitting a determination of a reasonable royalty in regard to the video clips at issue. However, the record does not contain any such evidence. Moreover, the evidence establishes a very low likelihood that there will be a further infringement of the type at issue.[19] Accordingly, in the absence of any ability to determine an amount on a principled basis, the Court finds it reasonable to permit future uses of the type at issue upon the payment of $100.00 for each such use.

IV.   CONCLUSION

For the foregoing reasons, the Court decides that it shall issue a separate Conditional Injunction Order providing that Defendants shall not:

> 1. Sell highlight films of the 1996-98 season in which the Flying B Logo is shown unless Defendants, prior to any such sale, shall pay Bouchat a one-time permanent royalty of $721.65.

---

salaries of $120,000,000.00 for the season, on a per game basis, these salaries alone would exceed the gross receipts from ticket sales. Of course, the team has a myriad of expenses in addition to player salaries, as well as income derived from other sources that would need to be considered in making a determination of the expenses fairly allocable to ticket receipts.

[19] The Court is not here addressing the possibility that brief excepts from video clips of 1996-98 Ravens games might be shown on the stadium scoreboard on special occasions rather than, as in the instant case, during the course of football games to show prior action between the teams contemporaneously playing.

15

      2.   Show on the scoreboard at Ravens home games, video clips from a game against the same opponent during the 1996-98 season displaying the Flying B Logo,[20] without paying Bouchat a royalty of $100.00 for each video clip shown.


SO DECIDED, on Thursday, December 27, 2012.

                                                    /s/
                                        Marvin J. Garbis
                              United States District Judge

---

[20] This decision does not relate to showings at Ravens games of video clips for other purposes, including, but not limited to, ceremonies honoring former Ravens personnel.